Harris, J., (dissenting.)
This case is characterized by a degree of novelty far beyond any thing of the kind with which I have before met. Some of the circumstances are so strange, indeed, that they demand the most active scrutiny. The prin *43 cipal actors, Valton, Martin, Schumacher and Oltman, were all Germans. About the 1st of May, 1850, Valton, Martin and Schumacher made their appearance in Albany, and pretended to engage in the liquor business, as copartners. Martin had, indeed, made application for a policy of insurance for §10,000 upon the life of a friend of his partner as early as February or March in that year, but where he then resided, or how he came to make the application, does not appear. Of the previous history of the parties we learn but little 'from the case, and that, chiefly, from the testimony of Oltman. Valton, who had been a tanner, and at one time had kept a tavern in Germany, came to New York in January, 1848. He lived with his son-in-law, who kept a grocery and liquor store in New York, doing nothing. Martin, according to Oltman’s testimony, had traveled in Germany, taking orders for liquors, cigars, (fee. When he came to this country does not appear, but Oltman speaks of having seen him in New York three years before the trial. He told Oltman that he lived in the upper part of New York and sold liquor, but Bussing, Valton’s son-in-law, says that he had lived in New York eight years, and that during that time Martin had not been in business there. Schumacher, it seems, was from Bremen. Oltman says he knew him there more than twelve years ago. He saw him often “ at the public houses, nights,” but never at his place of business, though he thought he was a clerk or bookkeeper in a wine store. He told Oltman that he came to this country ten years ago, but where he had been, or how he had been employed, we are not informed. The first we hear of him in America is, when he made his appearance in Albany in May, 1850, as a member of the firm of Val-ton, Martin <fc Co. The account which Oltman gives of himself is, that in Germany he had been a clerk in a court of justice, and when traveling he mixed liquors. He came to this country, late in the year 1849, and was without employment until March following, when he hired himself to a farmer on Long Island for a year, at jive dollars a month. His employer says he found him a little tricky, and on the first of July he left and came to Albany, and became a porter for the firm of Valton, Martin & *44 Co., receiving wages at the rate of $15 per month and boarding with Martin. He left Albany in March, 1851, and went to Milwaukie. From that time to September, 1852, when he was examined upon commission, at La Forte in the state of Indiana, he had been drifting about, remaining but a few weeks in any single place, and without any steady employment.
Whether any of the parties had any money when the business was commenced at Albany, does not appear. The articles of copartnership do not require either party to furnish any capital, and there is no evidence that any was in fact contributed. Mr. Tracy, of whom they hired their store, at a rent of $250, and whose place of business was opposite theirs, says they appeared to be doing a limited business. He had dealings with them to the amount of five or six hundred dollars, selling them goods upon a credit of three months. Mr. Lacy, whose office was also opposite the store, had his attention frequently directed to it, and saw that little or nothing was going on there. He saw a few barrels lying there, and occasionally saw Schumacher go out with demijohns and baskets of liquor. That three partners, engaged in such a business, should require the services of a man like Oltman, as a porter, especially when Schumacher, according to the evidence, continued, as well afterwards as before, to act as the porter of the establishment, is a little remarkable. Valton spent much of his time in New York, and the only business in which Martin is shown to have been engaged was that of obtaining and securing for the benefit of himself and Valton this large policy upon the life of Schumacher.
When Schumacher finally left Albany, or under what circumstances he left, the case does not disclose. Bussing speaks of having seen him at his store several times—he mentions three or four occasions—between the latter part of May and the middle of August. That he was destitute of money appears from the fact that when, on the 23d of August, he went to the Shakespeare Hotel to board, he proposed to pay for his board in advance, as he had no baggage, and said he would fetch the money from his boss, referring to Valton. That he had been staying in New York before he went to the Shakespeare Hotel, appears *45 from the fact that the letter which purported to enclose to Martin the second quarter’s premium upon his policy, bears date, and was postmarked in Hew York two days before. Hor is it very likely that he would have had occasion to send back such a letter, if he had himself but just before left Albany. What he was doing all this while in Hew York does not in any way appear, except that Oltman says he told him he went to Hew York to procure a store for the firm. That this was in fact his business, there is not much reason to believe. There is no evidence that the firm contemplated either a removal to Hew York, or the establishment of a branch of their business there. And, besides, Yalton was already there, and had been for a considerable part of the summer, and if a store was desired, he would have been, it would seem, quite competent to obtain it.
Again; it is a little singular that when Yalton and Schumacher were both in Hew York, Oltman too should take occasion to go, and to remain there for several days. He says he went to look for a, friend that he heard was to be there. Whether that friend was Schumacher does not appear. At any rate, he was so fortunate as to find him standing upon the wharf, upon his arrival, and we hear nothing more of any other friend. And then, the incidents connected with the drowning, as they are related by Oltman, are marvellously strange. The very proposition of Schumacher to go a fishing, at such a time, and in such a place, and under such circumstances, is strange. The account given by Oltman of the manner in which the accident occurred, is strange. The conduct of Oltman, afterwards, is strange. It is strange, that though he afterwards went to the man of whom the boat was hired to know if he had obtained it, he should be entirely unable to give any information either as to his name'or residence, so that he may be found. It is strange, too, that after the body alleged to be that of Schumacher was found, there was no one to identify it but this same witness Oltman. It is a suspicious circumstance, too, that Martin, after having sold out his interest in the policy to the plaintiff Adams, should have disappeared, and that no one, neither Bussing nor Oltman, should know what had become of him. He might have *46 been a most material witness in the case. There are many circumstances which need explanation, and which might, perhaps, • have been explained by him, if the transaction was entirely fair.
But the evidence was fairly and properly submitted to the jury, and their verdict upon the question of fraud is conclusive. The application for a new trial must, therefore, be denied, unless some error has been committed, either in the admission or rejection of evidence, or the refusal of the judge to charge as requested by the counsel for the defendants. I proceed, therefore, to notice some of the exceptions taken upon the trial.
By the first cross-interrogatory, the witness Oltman was required to state what was his occupation before he left Germany, and "whether he pursued one, or more, and with whom and where he lived. He was also required to describe each occupation particularly, and the places where, and the persons with whom ■ he had pursued it. The only answer to these inquiries is, that his occupation before he left Germany was that of a clerk in a court of justice ; that he lived with his mother in Ovelegonne; that he sometimes followed the mixing of liquors in Ovelegonne and in Bremen ; that he did not recollect the names of the persons for whom he mixed liquors—he did it token traveling.
The ninth cross-interrogatory required the witness to state what was the business in which, after May, 1850, Martin <fc Val-ton were engaged, and of whom they bought, and to whom they sold, and what they bought and sold. To this his only answer was, that he knew nothing of their business until afer the forepart of July, 1850.
Both these interrogatories were pertinent. The witness was a stranger and a foreigner. His testimony was of vital importance in the case. His story, which must be believed, or the action must fail, was such as would not be likely to be believed without full confidence in his integrity. The plaintiffs, instead of bringing him into court, had chosen to examine him upon commission, in a remote part of the country. Under these circumstances, it was the right of the defendants to have all the tests of credibility within their reach applied to him. It was natural and peculiarly proper that they should inquire into the *47 history of his life. They were entitled to a full and explicit answer to each inquiry. This they did not receive. When called upon to state what his various occupations had been, and to describe each particularly, and the places where, and the persons with whom such occupations had been pursued, the only answer is, that before he left Germany he was clerk in a court of justice, and that he sometimes followed the mixing of liquors, <fcc. These ansAvers are evasive and unsatisfactory. They furnish no aid in determining Avhat the life of the Avitness had been, or what really had been his pursuits.
The answer to the ninth cross-interrogatory is still more objectionable. The witness had been in the employ of Valton & Martin from the forepart of July, 1850, until March, 1851. As appears from the case, he was the only person in their employ. The ground of defense in the action Avas, that though Valton, Martin <fc Co. pretended to be engaged in business as liquor dealers, their real business Avas to practice a fraud upon the defendants. Under such circumstances, they had a right to a full and direct ansAver to the inquiry of whom Valton & Martin bought, and to whom they sold, and Avhat they bought and sold. The inquiry embraced the whole period in which they were engaged in business, after May, 1850. The answer is palpably evasive. It was proper enough for the witness to state that he had no knoAvledge in respect to the business prior to the forepart of July, but that certainly was no reason Avhy he should be excused from stating Avhat he IcneAY about it, after that date. Had the AA'itness been upon the stand at the time, the presiding judge would not" have hesitated to require him to answer the interrogatories more fully. If he had refused, the whole of his testimony might have been stricken out.
The rule in respect to the examination of witnesses upon commission is, that the witness must answer all the interrogatories substantially. A failure to do so, is fatal to the whole deposition. The reason of the rule is obvious. Where a Avitness has assumed to withhold his answer to a part of the interrogatories, the fair inference is, that the commission has been imperfectly executed, or that the deposition does not contain the *48 whole truth. It is no hardship upon a party that, when he is excused from bringing a witness into court, so that he may be cross-examined in reference to his answers upon his direct examination. he should at least be required to obtain from him full and explicit answers to such interrogatories as may be prepared for his cross-examination, before he testifies. (See Kimball v. Davis, 19 Wend. 437; Brown v. Kimball, 25 id. 259 ; Smith v. Griffith, 3 Hill, 333.) It is a question to be determined upon the trial, whether the witness has omitted to answer any material interrogatory. If he has, the deposition is to be rejected, on the ground that the witness has not told the whole truth. I think the objection in this case -was well taken. Upon the issue of fraud, it was clearly pertinent to ascertain the nature and extent of the business in which Martin and Yalton were engaged. These were matters peculiarly within the knowledge of the witness. Appropriate interrogatories were framed to call out such knowledge, and yet the defendants have entirely failed to obtain any answer upon the subject. The commission must, therefore, be deemed to have been imperfectly executed,
I think, too, the defendants should have been permitted "to show what Oltman had said in relation to the death of Schumacher. He was the only witness to prove the strange circumstances connected with that event. He had been asked in the eleventh cross-interrogatory, whether he had made a statement of the occurrence to Mr. Lacy, and in the twelfth interrogatory, whether he had stated to Mr. Lacy that they were not fishing when Schumacher fell overboard, or that he fell overboard in a fit, or that the witness fell overboard also, or that he knew that Schumacher’s life was insured, or that Yalton had told him so, or that Schumacher had left Albany and gone to New York to look for a place to keep a store, or that Schumacher when he was drowned had on yellow nankeen pantaloons; To all this, the witness had answered merely, that he did not know what he had stated on the subject. Mr. Lacy, being examined as a witness for the defendants upon the trial, stated that on the 7th of September, Martin came to his office, and informed *49 him of the death of Schumacher. Upon asking him how he ascertained it,' he said there was a person at his store who could tell him all about it; that he went with Martin to his store, and there saw Oltman ; that he asked him how the death occurred. I cannot see why it was not competent for the defendant to show by Lacy what Oltman then said on the subject. Martin, who was then a party in interest, had referred to Oltman for information on the subject. He was present when the statements were made. Oltman had been fully interrogated as to what he had said on that occasion, and to the whole he had simply answered that he did not know what he had said. The foundation had thus been laid for the admission of any contradictory statements which Oltman may have made when giving to the witness Lacy an account of the circumstances, immediately after the death was alleged to have occurred. I think the learned judge erred in excluding the evidence.
It was insisted upon the trial that the evidence warranted the jury in finding that, though the policy was taken in the name of Schumacher, yet it was in fact the policy of Valton & Martin, or one of them. The defendants’ counsel accordingly asked the judge to charge the jury that if they should find that Martin or Valton, or either of them, procured or paid for this policy, for their own benefit, though with the assent of Schumacher, it was void, as being a wager policy. I am inclined to think the defendants were entitled to have the jury so instructed. Valton & Martin had no such pecuniary interest in the life of Schumacher as would entitle them, for their own security or indemnity, to insure his life. A policy taken in the name of either or both of them would have been void as a wager policy. (1 R. ¡S. 662, s§ 8, 9,10.) They could not, by merely obtaining the use of Schumacher’s name, accomplish indirectly what they could not do directly. If-the policy, from the first, really belonged to Valton & Martin, or one of them—if in fact, Schumacher never had any interest in it, then it was but an attempt to evade the statute against wagers, to take the policy in the name of Schumacher. I am inclined to think the jury would have been warranted in finding that this was so. *50 According to the testimony, Martin was the only man who ever interested himself to procure the policy. Long before Schumacher came to Albany, he had applied to the defendants’ agent for a policy of $10,000 on the life of a friend. It was he that applied for the preliminary papers. It was he that answered the objections made by the agent, and again by the examining physician, to the taking of such a risk. It was he that, on both occasions, paid to the agent the premium of insurance. From first to last, the whole. transaction seems to have been under his special management and supervision. ■ Indeed, by the very terms of the articles of copartnership, it was only in case of a dissolution of the partnership before the death of Schumacher, or his marriage, that he could have any interest in the policy. Under these circumstances, the jury might well have found that the whole thing was designed for the exclusive benefit of Valton & Martin; that the premiums were in fact paid by them for their own benefit, and that the pretense that money had been forwarded from New York by Schumacher to pay the premium for the second quarter, when he was shown to have been so destitute that he was obliged to obtain money from Valton to enable him to pay four dollars for a week’s board, was only designed to conceal the more effectually the real transaction.
' Whether a person can insure his own life for the benefit of another who has no insurable interest, and who himself pays the premiums, is a question which has not been adjudged. It came before Lord Abinger twice, at the circuit, in Wainwright v. Bland, (1 Mood, & Rob. 481; Same case, 1 Mees. & Wels. 32,) but upon the review of the case, the motion for a new trial was decided without touching this question. In that case, the policy was in the name of Helen Francis Phebe Abercrombie. She was an orphan, of the age of twenty-one years, and resided with the plaintiff, who was a near relative. Her only means of subsistence was an annual pension of ten pounds'. In October, 1830, she had, in company with the plaintiff’s wife, applied for and obtained the policy in question. She had previously obtained other policies, in all amounting to £16;000, *51 the annual premium upon which was £200. The money to pay the premium was lent to her by the plaintiff. She died in December after she had obtained the policy, leaving a will by which she appointed the plaintiff her executor. It was proved that shortly before her death she had assigned two other policies to the plaintiff, for a nominal consideration. Evidence was also given to show that misrepresentations were made at the time of obtaining the policy, in relation to other insurances, and the object in effecting the insurance. Lord Abinger charged the jury that the question in the case was, who was the party really and truly effecting the insurance. Was it the policy of Miss Abercrombie, or was it substantially the policy of Wainwright, the ¡plaintiff, he using her name for his own purposes ?- If it was the policy of Miss Abercrombie, effected by her for her owp benefit, her representative was entitled to put it in force. The plaintiff might lend her the money to pay the' premium, and yet the policy continue her own. But if, looking at the strange facts which had been proved, the jury should come to the conclusion that the policy was in reality effected by the plaintiff; that he merely used her name, himself finding the money, and meaning, by way of assignment, or by bequest, or in some other way, to have the benefit of it himself, then the transaction would be a fradulent evasion of the statute, and their verdict should be for the defendant. The judge then proceedéd to submit to the jury the further question as to misrepresentations, and concluded by saying that the main question was, whether the policy was bona fide the policy of the deceased ; that if it was, and no material fact was concealed from the underwriters, the verdict should be for the plaintiff; otherwise for the defendants. The jury having disagreed, the cause was again tried before the same judge. He recommended the jury to find a verdict for the defendants, if they thought the policy was really and substantially the policy of Wainwright, the plaintiff, he putting forward Miss Abercrombie as a mere instrument, and effecting the policy in her name, with the design of getting the benefit of it himself either by will or assignment or by some other means; or if they thought the *52 misrepresentations as to the motive of the assured in effecting the policy, or as to the policies already effected, were misrepresentations of facts material to be known by the insurers. The jury found a verdict for the defendants, and added that they were of opinion that the policy was substantially the policy of Wainwright himself, and also that the mirepresenfcations were of facts material to be known by the insurers. Upon the motion for a new trial, Lord Abinger himself, and Park, B., both said there might be some doubt upon the first point; but, without giving any opinion upon this question, the verdict of the jury was sustained upon the point of misrepresentation.
The question, therefore, cannot be regarded as having been determined by express adjudication. But, it seems to me to be within the plain meaning of the statute, and obviously within the mischief contemplated by the legislature. The object of the statute was to prevent wagering and speculative policies by third persons having no interest in the subject of insurance. “ Insurances made in good faith for the security or indemnity of the party insured,” are alone declared to be valid. If this policy was, in the language of Lord Abinger, really and substantially the policy of Valton & Martin, or one of them, they putting forward Schumacher as a mere instrument and effecting the policy in his name, with the design of getting the benefit of it themselves, the contract is not within the exception of the statute protecting insurances made in good faith for the security or indemnity of the party insured. There was neither security nor indemnity in the case. It was a mere wagering policy and within the prohibition of the 'statute. (See 3 Kent’s Com. 369, note d.)
The motion for a new trial on the ground of surprise could not have prevailed. Such a motion is properly made at a special term, as a non-enumerated motion. If the court deem it proper to have it heard with a motion for a new trial upon a case or exceptions, an order may be made to that effect. In this case, the motion was made at a special term, at the same time the motion was made upon the merits. It is too late now, *53 when the question comes up on an appeal from the order, to insist that the motion was irregular.
Albany General Term,
December 4, 1854.
But upon the merits, the motion could not be granted. The defendants’ counsel, according to his own statement, instead of requiring the attendance- of Adams and Parke by subpoena, thought fit to rely upon the assurance of Adams that he would attend the trial. It is indeed, a little singular that both Adams and Parke, situated as they were in reference to this action, after attending upon the trial two days, should have business which required that they should absent themselves, while the evidence was being produced. Such an occurrence was undoubtedly a surprise upon the defendants’ counsel. But having failed to put them under legal obligation to attend, -they are chargeable with a want of legal diligence, which is a sufficient answer to a motion for a new trial on the ground of surprise.
But, for the reasons already stated, I think there should be a new trial. Nor do I regret to find myself brought to this conclusion. The novelty of the case; the mystery that still seems to envelop some of its principal features; the character and circumstances of the chief actors in the transaction, and especially the principal witness in the case, all tend to encourage the belief that the ends of justice may be advanced by allowing the parties to present the facts anew before another jury.
New trial denied.
Wright, Harris and Watson, Justices.]